**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **LAZER & LAZER CORPORATION,** | : | |
| **Plaintiff,** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **AGRONOMED PHARMACEUTICALS** | : | |
| **LLC et al.,** | : | **No. 21-2253** |
| **Defendants.** | : | |

<u>**MEMORANDUM**</u>

**Schiller, J.**                                                                                                        **August 1, 2022**

As Bob Dylan once sang, and as the plaintiff to this action surely has thought on several occasions: "They'll stone you when you're trying to make a buck." Bob Dylan, Rainy Day Women #12 & 35, Columbia Records (1966).

Presently before the Court are cross-motions for summary judgment from Plaintiff[1] Lazer & Lazer Corporation, d/b/a Lazer Capital ("Lazer") and Defendants Agronomed Holdings Inc. ("Agronomed Holdings"), Agronomed Biologics LLC ("Agronomed Bio"), Agri-Kind LLC ("Agri-Kind"), and Agronomed Pharmaceuticals LLC ("Agronomed Pharma") (collectively, "Agronomed"). Agronomed is a Pennsylvania-based cannabis company. Lazer is a Toronto-based "finder" that specializes in facilitating certain types of business transactions between companies. In mid-2020, Lazer had high expectations that it could arrange a transaction between Agronomed and Verano Holdings Corporation ("Verano"), an Illinois-based cannabis company. Agronomed was ultimately acquired by Verano in April 2021.

In essence, Lazer believes that Agronomed left it high and dry after it wheedled its way out of paying Lazer in connection with its acquisition. Lazer argues that a standardized form circulated

---

[1] The Court notes that, disappointingly, both Lazer's response and reply briefs were tardily submitted.

to Agronomed in June 2020, coupled with some hazy emails from Agronomed CEO Jon Cohn, suffced to establish a contract for Agronomed to pay Lazer a fee should Agronomed and Verano one day enter into an agreement themselves. But any budding arrangement between Lazer and Agronomed went up in smoke after they ceased contact in July 2020. After Verano found its pot of gold in the form of acquiring Agronomed nearly a year later, Lazer threw a Hail Mary Jane and solicited Agronomed for the monies it believed it was owed—or, rather, Lazer thought it deserved a token of appreciation for its minimal involvement in the Agronomed-Verano acquisition. Agronomed left Lazer on the back burner and refused to pay, and Lazer sued Agronomed shortly thereafter.

Put bluntly, the Court finds that there was no express contract between Agronomed and Lazer, nor any services rendered by Lazer on Agronomed's behalf in furtherance of the Agronomed-Verano acquisition. Accordingly, the Court will grant summary judgment for Agronomed on all counts and deny summary judgment for Lazer as to Count One. A more in-the-weeds explanation of the Court's decision follows.

## I.     BACKGROUND

### A.     Agronomed and Verano's Introduction and 2018 Negotiations

Agronomed operates a vertically integrated cannabis cultivation, processing, and dispensary business in Pennsylvania, comprising four entities: Agri-Kind, Agronomed Holdings, Agronomed Bio, and Agronomed Pharma. (Declaration of Jon Cohn [Cohn Decl.] ¶ 4.) Agri-Kind owns a license issued by the Commonwealth of Pennsylvania that allows it to cultivate and process medical cannabis. (*Id.* ¶ 5.) Agronomed Holdings owns the real estate and facility where Agri-Kind bases its cultivation operations. (*Id.* ¶ 6.) Agronomed Bio owns a Commonwealth-issued Clinical Register ("CR") permit under which it operates six cannabis dispensaries in Pennsylvania.

(*Id.* ¶ 7.) Through January 2021, the Franklin Group ("Franklin") owned a 50% interest in Agronomed Bio. (*Id.*) Agronomed Pharma provides back-office services to the other Agronomed entities. (*Id.* ¶ 8.) Agronomed Pharma's board of directors (the "Agronomed Board") oversees all Agronomed entities' operations and governance. (*Id.* ¶ 10.) Cohn co-founded all four Agronomed entities and served as their CEO during the relevant time period. (Defs.' Statement of Undisputed Material Facts [Defs.' SUMF] ¶ 6.)

In 2018, Agronomed was actively seeking investors for a new capital raise. (Cohn Decl. ¶¶ 11-12.) In connection with the capital raise, Corey Fitze, a consultant working on behalf of Verano, introduced Cohn to Verano's co-founders George Archos and Sammy Dorf. (*Id.* ¶ 12; Deposition of Jon Cohn [Cohn Dep.] at 21-22.) Verano is a multi-state cannabis operator that, in 2018, had recently grown its operations beyond its founding state of Illinois and was looking to expand to other states. (Defs.' SUMF ¶ 9; Cohn Dep. at 22.) Fitze has no relation to Lazer. (Defs.' SUMF ¶ 8.)

After Fitze's introduction, Cohn met with Archos and Dorf to solicit Verano to participate in Agronomed's capital raise. (Cohn Decl. ¶ 14.) Archos and Dorf, however, informed Cohn that Verano was more interested in a merger or acquisition. (*Id.* ¶ 15.) In October 2018, Dorf attempted to negotiate a deal with Cohn for Verano to acquire Agri-Kind. (*Id.* ¶ 16; Cohn Decl. Exs. 2-3.) Eventually, Cohn informed Dorf that Agronomed was not interested in selling its assets at that time and talks between Agronomed and Verano ceased in December 2018. (Cohn Decl. ¶¶ 17-18; Cohn Decl. Ex. 4; Cohn Dep. at 30-31.)

### B.    Agronomed and Lazer First Interact and Agronomed Bio Faces Issues

On July 29, 2019, Greg Lipschitz, Vice President of Lazer, contacted Cohn for the first time. (Defs.' SUMF ¶ 15; Pl.'s Statement of Undisputed Material Facts [Pl.'s SUMF] ¶ 5.) Lazer

is a merchant bank based in Toronto, Canada that serves as a finder in the cannabis space by making strategic introductions and advising on transactions. (Pl.'s SUMF ¶ 1; Deposition of Greg Lipschitz [Lipschitz Dep.] at 54-57.) In an email with the subject line "Reaching Out – Potential Investors," Lipschitz wrote that he was "reaching out to discuss potential investment opportunities and strategic partnerships" and asked if he and Cohn could meet in Pittsburgh that week. (Pl.'s Ex. 3 at LAZ000193-94.) Cohn asked that they speak on the phone instead, which they did on July 30. (*Id.* at LAZ000193; Pl.'s Ex. 5 at LAZ000383.) Lipschitz thereafter intermittently checked in with Cohn through mid-2020, but Lazer ultimately did not connect Agronomed with any potential investors. (Defs.' SUMF ¶ 18; Pl.'s SUMF ¶ 8; Lipschitz Dep. at 87-89; Pl.'s Ex. 5 at LAZ000376-83.)

In early 2020, Franklin informed Agronomed that it was unwilling to provide capital to build a physical facility for Agronomed Bio and that it wished to divest its 50% interest. (Cohn Decl. ¶¶ 23-24; Cohn Dep. at 19-20.) Agronomed did not have the funds on hand needed to build Agronomed Bio's facility. (Cohn Decl. ¶¶ 23-24; Cohn Dep. at 19-20.) On April 1, 2020, without a facility from which it could operate, Agronomed Bio received a corrective action notice from the Commonwealth of Pennsylvania putting it at risk of losing its CR permit. (Cohn Decl. ¶¶ 25-26.) The notice required that Agronomed Bio provide the state with a memorandum detailing how and when it would become operational. (*Id.*) Agronomed did not feel as though it could provide such a memorandum until it could find a party to purchase Franklin's interest in Agronomed Bio. (*Id.* ¶ 27.) It aggressively sought a purchaser.

### C.    Agronomed and Lazer Reconnect as Verano Reenters the Picture

Franklin engaged Kronos Capital Partners ("Kronos"), another finder in the cannabis space, to help it find a potential purchaser of its interest in Agronomed Bio. (*Id.* ¶ 29.) Kronos and

Franklin's agreement called for Agronomed Bio to compensate Kronos if Franklin were to sell its interest to one of the companies on Kronos' list of potential counterparties (the "Franklin Kronos List"). (*Id.* ¶ 30.) On April 2, 2020, Jeff Bowman of Kronos emailed Jason Glickman, a member of Franklin's ownership group, suggesting Verano as a potential purchaser of Franklin's interest. (Defs.' SUMF ¶ 24; Cohn Decl. Ex. 5 at AGR_0000760-61.) Glickman forwarded the email to Cohn, who replied that he "spoke to [Verano] before about Agri-Kind" and that "[t]hey could be a viable party." (Cohn Decl. Ex. 5 at AGR_0000760.) Cohn warned, however, that time was not on Agronomed's side for a buyout-based transaction with Verano, since "we have to give [the Commonwealth of Pennsylvania] a corrective action plan in 29 days with how we are going to get operational – which we are expected to follow." (*Id.*) He also cautioned that Verano may not be a good fit for a transaction because it had "only done acquisitions previously." (*Id.*) Verano was nevertheless added to the Franklin Kronos List. (Cohn Decl. ¶ 33; Cohn Dep. 71-73, 101.)

Agronomed had also separately engaged Kronos to help it find a purchaser for Franklin's interest, as well as to raise capital for Agronomed Bio and Agri-Kind generally. (Cohn Dep. at 101-02.) Agronomed also engaged Young America Capital ("Young America") and GreenVision for the same purpose. (*Id.*) Although Verano was on the Franklin Kronos List, Verano was not a potential counterparty as it related to Agronomed's engagement with Kronos, Young America, or GreenVision. (*Id.* at 72, 101-02.)

On May 27, 2020, Lipschitz emailed Cohn and asked to speak on the phone. (Defs.' SUMF ¶ 28; Pl.'s Ex. 5 at LAZ000376-77.) They scheduled a phone call for the following day and Cohn sent Lipschitz copies of Agronomed's latest decks. (Pl.'s Ex. 5 at LAZ000376.)

Following the phone call, Lipschitz emailed Cohn, copying Dorf and Lazer co-founder Dean Lazer. (Pl.'s Ex. 6 at LAZ000560-61.) Lipschitz told Cohn that he and Dean Lazer had

spoken with Dorf and asked Cohn when he could "discuss potential opportunities/collaborations." (*Id.*) The group scheduled a call for June 1. (*Id.* at LAZ000558-59.) After the call, Dorf copied Edward Shen, Verano's Head of Mergers and Acquisitions, to the email thread, and Shen sent Cohn a non-disclosure agreement ("NDA"). (*Id.* at LAZ000556-58.) Cohn and Shen executed the NDA. (*Id.* at LAZ000556-57.) Cohn then sent Dorf Agronomed's decks for his review. (*Id.* at LAZ000555.) Lipschitz, Dean Lazer, Cohn, Dorf, Shen, and Agronomed Vice President Chad DiFrancesco then met via Zoom on June 3, 2020. (*Id.* at LAZ000554-55; Lipschitz Dep. at 178.)

After the Zoom, Lipschitz emailed Cohn and Eric Lazer, Lazer's other co-founder, informing Cohn that he was sending him Lazer's "standard engagement agreement with a 3% M&A fee for Verano." (Pl.'s Ex. 8 at LAZ000599-600.) Lipschitz attached a document titled "Strategic Business Services Agreement" (the "June 3 Document"). (Cohn Decl. Ex. 8 at LAZ000572-73.) The June 3 Document stated that if Agronomed were to engage in a change of control transaction with Verano within a twelve-month term, Lazer would be entitled to a payment of a fee equal to 3% of the total consideration paid to Agronomed in connection with the transaction. (*Id.* at LAZ000576.) In full, the relevant portion—Section 3.01(a)—of the June 3 Document stated as follows:

> At any time during the term of this Agreement, in the event the Company consummates a Change of Control to Verano or any of its affiliated entities, the Company shall pay to the Advisor immediately prior to the consummation of such Change of Control, Equity Securities in the Company or cash (at the sole discretion of the Advisor) having a value equal to 3% of the aggregate consideration paid by the acquiror to the Company and/or the Company's securityholders in such Transaction.

(*Id.*)

The June 3 Document contained blank spaces in place of the effective date and counterparty. (*Id.* at LAZ000573 ("The Strategic Business Services Agreement . . . is made as of

[•], 2020 . . . by and between LAZER & LAZER CORPORATION . . . and [•], a corporation exiting under the laws of [•].").) Section 3.01(a) was the only time Verano was mentioned by name in the June 3 Document. (*Id.* at LAZ000573-87; Cohn Dep. at 83-84.) Lipschitz considered the June 3 Document to be a "template" and "sent it on [the] assumption" that the missing terms would eventually be filled in. (Lipschitz Dep. at 183.)

Cohn reviewed the June 3 Document with the Agronomed Board, which took issue with Lazer's fee. (Pl.'s Ex. 8 at LAZ000599.) Later on June 3, Cohn asked Lipchitz if he would be open to modifying the fee structure. (*Id.*) Cohn said that the Agronomed Board had three main reasons for seeking to change the fee structure: Lazer "re-intro[duced]," and did not "straight intro[duce]," Agronomed to Verano, since Agronomed and Verano had previously discussed a transaction in 2018; Verano was on the Franklin Kronos List, which meant that Agronomed Bio might owe Kronos a fee if Verano were to purchase Franklin's interest, and Agronomed now had to ask Kronos to remove Verano from the list; and a transaction between Agronomed and Verano would likely be sizeable, exceeding $100 million. (*Id.*) He said that Agronomed would be "OK signing the engagement" if Lazer's fee were instead 2% for the first $110 million of the transaction and 3.5% for any amount over $110 million.[2] (*Id.*)

_____

[2] The full text of this email is as follows:

> I had a chance to speak with my board tonight, and they were not comfortable with the 3% for an M&A deal for a few reasons. The first was fact that it wasn't a straight intro, but was a re-intro which we do appreciate and acknowledge has value. The second is that [Verano was] actually on a list from Kronos Capital (a group that [Franklin] engaged to perform M&A deals on our behalf) – but they have not had the call with them yet (but we need to now try and negotiate to get Verano off their list). The last is due to the size of the transaction (being over 100M).

> In either case, the Kronos contract was at 2% up to 110MM (for 100% of both companies) and 3.5% for any amount over 110MM, so if you guys are willing to take the same 2 deal, we are OK signing the engagement. I apologize the confusion on this today, but we want to be fair to all parties concerned.

Lipschitz replied on June 4, agreeing to the modified fee structure and asking that Cohn make the corresponding edits to the June 3 Document:

> Thanks for explanation- this was very helpful in giving us context to the situation. Yes we are in agreement to change the terms to 2% up to $110m and 3.5% for an amount greater than $110m. If you can make those changes, that'd be great. Thanks and looking forward to working together.

(*Id.* at LAZ000598.)

Cohn never edited the June 3 Document. (Cohn Decl. ¶ 45.) Instead, later on June 4, Cohn emailed Lipschitz stating that "there is no way [the June 3 Document] can be executed in its current state" after Agronomed's counsel raised further concerns about the fee structure:

> We went through the agreement with both inside and outside counsel, and there is no way it can be executed in its current state. I was not aware that you are not a registered broker, and unless you and your counsel works out an approach based on the M&A advisement memo that many in our space leverage for protection, [with] a full indemnification to Agronomed for any potential conflicts, securities violations, etc. we can not sign such an agreement since the current one violates US securities laws.
>
> []
>
> If you are not registered, and you are going to work on a commission basis for the sum of the transaction, the only way we are aware that you could possibly do such a thing is to work on behalf of the buyer, and not the seller.
>
> In no way am I trying to squeak out of having you paid for services, and I am OK if our terms are embedded in the buyer side of the transaction (as then you are truly working as a consultant on the deal per our understanding), the way the agreement

---

> Also, attached is the exclusions list (schedule C we had as an example with [Young America]). Given this is a nonexclusive, and we would require approval of any party other party than Verano added to scope, we wouldn't really need an exclusion list with you guys, but I do need to review the engagement letter in detail to be sure. I just finally got back to my office after a crazy day at the facility.
>
> Please let me know, and if we OK with this deal, we are happy to move forward.

(Pl.'s Ex. 8 at LAZ000599.)

is written exposes Agronomed to known securities violations, such that there is no real way we can modify it to make it legal. The only way that I know of personally (from our side) is if we work out a fixed fee for your work (from seller side), but if it is contingent on close – which it would have to be, or else there is no way we would commit to that otherwise, we would be in violation of securities law.

All that being said, we are willing to take less from the buyer for the agreement that we discussed (and they buyer can pay you), but that would need to be a buyer side agreement, not a seller side.

Please let me know if you have questions. We are looking forward to moving forward, but simply cannot sign that agreement and expose our company to liability.

 (Pl.'s Ex. 8 at LAZ000597-98.)

On June 5, Lipschitz replied to Cohn, explaining that the terminology in the June 3 Document "refers specifically to raising capital," and Lazer "[is] not raising capital (and receiving a corresponding commission based on raising capital), and [doesn't] want to be perceived as such." (*Id.* at LAZ000597.) He attached a redlined version of the June 3 Document (the "June 5 Document") removing language in Section 2.02(d) to clarify Lazer's role as an "M&A advisor" to a potential transaction. (*Id.*; Cohn Decl. Ex. 11.)

Section 2.02(d) was the only part of the document to which edits were made. The rest of the June 5 Document remained unchanged from the June 3 Document. Notably, the June 5 Document still did not contain an effective date or identify Lazer's counterparty. (*Id.* at LAZ000601.) The fee structure was also unchanged. (*Id.* at LAZ000604 (calling for a 3% fee).)

Lipschitz followed up on June 9 to inquire whether Agronomed's counsel was satisfied with Lazer's revisions. (Pl.'s SUMF ¶ 34; Pl.'s Ex. 13 at LAZ000632.) On June 10, Cohn replied that Agronomed's counsel still had concerns about the fee structure (the "June 10 Email"). (Pl.'s Ex. 13 at LAZ000631.) He further stated that, although Cohn was "OK with signing [the June 5 Document] as is for a pure M&A brokering," it was his understanding that "Verano has too many

concerns with [Agronomed Bio's CR permit] to move forward anyway" and asked Lazer to "hold off." (Pl.'s Ex. 13 at LAZ000631.) Cohn also stated that "[i]f Verano does move forward on this transaction, we do commit to paying the fees to you guys (and signing your agreement) at the time of next steps (or now if we just make the agreement scoped to Verano)." (*Id.*) The June 10 Email is reprinted in relevant part below:

> [Agronomed's counsel] asked why the agreement didn't reference the M&A exemption memo and with such an agreement, how you could provide the value add services that was indicated would be offered?
>
> Honestly, I am OK signing it as is for a pure M&A brokering, but as I understand it, Verano has too many concerns with the CR side of the permit (potential limitations that we don't believe will exist – but no one has a crystal ball) to move forward anyway. If that is the case, we would just assume hold off, as we do have a number of brokers actively working on this for us, and it doesn't make sense to engage anyone else at this time, unless it is with Verano, as they are not covered under any other broker arrangement we currently have. We do have 3 parties actively brokering all with separate lists, and managing the lists and exclusions is getting too cumbersome.
>
> That being said, if Verano does move forward on this transaction, we do commit to paying the fees to you guys (and signing your agreement) at the time of next steps (or now if we just make the agreement scoped to Verano). They also haven't sent over their financials, etc. so it leads me to believe they probably aren't interested.
>
> (*Id.*)

On June 11, Lipschitz replied that Verano had been "radio silen[t]" recently "not for a lack of interest" but because it had "been tied up closing [another] transaction." (*Id.*) He further stated that "[o]nce I get more info, we can further hash out the engagement letter, as we'll have more clarity into next steps." (*Id.*)

On June 13, Cohn emailed Lipschitz that they had received proposed term sheets from two other companies and "in the case [Verano] is interested time is becoming of the essence." (Cohn Decl. Ex. 13 at LAZ000647.) The next day, Lipschitz replied that he had "further requested [Dean Lazer] follow up with Verano" and on June 15 informed Cohn that "Verano will reach out within

a day or two" and "[t]here's still significant interest, just bogged down on a current transaction that should be wrapping up." (*Id.* at LAZ000646.)

Lipschitz was also in contact with Dorf as he corresponded with Cohn. On June 16, Dorf emailed Lipschitz asking him if he "h[ad] a breakdown of all the [cannabis cultivations] that are for sale" because he was "trying to figure out who is the best target." (Defs.' Ex. C at LAZ000642.) Dean Lazer, who was copied on the thread, replied that Lipschitz should not "respond unless [Lazer has] an engagement letter." (*Id.*; Defs.' Ex. D at LAZ000644.) Dorf replied, "[T]his is a formal invitation to come join the Verano team" and that "[Lazer] represent[s] us and [will] find the best valued grow that we can snag." (Defs.' Ex. C at LAZ000642; Defs.' Ex. D at LAZ000644.)

Meanwhile, on June 17, Lipschitz emailed Cohn informing him that "[a]t this time Verano won't be able to adhere to your timeline" because Verano "need[ed] some more time to figure out their other transaction." (Cohn Decl. Ex. 13 at LAZ000646.) Lipschitz told Cohn that he "wanted to let you know as soon as possible, so we don't hold you back from making decisions with your other prospective parties." (*Id.*) He then wished Cohn "goodluck [sic] with the current process." (*Id.*)

### D.    Verano Expresses Interest in Agronomed

One week later, however, Verano's interest in Agronomed piqued again. On June 23, Dorf emailed Lipschitz and Dean Lazer asking if they can "see what we can do on . . . agrikind." (Defs.' Ex. F at LAZ000650.) Lipschitz suggested that he set up a call with Cohn. (*Id.*) Dorf declined, instead requesting that Dean Lazer "just beat [Cohn] up and see what we can really get the grow for cash and stock [sic]." (*Id.* at LAZ000649.)

Nevertheless, on June 24, Lipschitz emailed Cohn asking if he was available for an "update call," and they spoke later that day. (Pl.'s Ex. 15 at LAZ000661-62.) On June 30, Dean Lazer sent

an email to Dorf, Archos, Shen, Cohn, and Lipschitz, stating only "Connecting you guys." (Pl.'s Ex. 19 at AGR_0000264.) After executing an NDA, Dorf and Cohn scheduled a Zoom meeting and shared diligence materials through secure data rooms. (*Id.* at AGR_000261-64.)

On July 3, Cohn stated that he was "hoping George could come [to Agronomed's facilities for a site] visit early next week." (*Id.* at AGR_000260.) Archos scheduled a visit for the following Wednesday, July 8. (*Id.* at AGR_000259.)

Archos did not show up for the site visit. (Cohn Dep. at 149-50; Cohn Decl. ¶¶ 72-73.) Neither Archos, Dorf, nor any other individual at Verano informed Cohn ahead of time that Archos would not show up. (Cohn Decl. ¶¶ 73-74.) Cohn interpreted Archos' absence as "a sign that Verano was not interested in pursuing any potential transaction with Agronomed in mid-2020." [3] (*Id.* ¶ 74; *see also* Cohn Dep. at 187 ("It wasn't just not a show up. They didn't call and say, hey, we're doing this or that. They just blew us off. So I think in business terms, that's pretty good telling you that we're not interested.").)

Agronomed and Lazer had no further communications in 2020. [4] (Defs.' SUMF ¶¶ 80-81; Lipschitz Dep. at 291-94.) Nor did Verano and Lazer. (Defs.' SUMF ¶ 69; Cohn Decl. ¶ 75; Lipschitz Dep. at 291-94.)

---

[3] The parties dispute whether they discussed Agronomed selling its assets to Verano in June or July 2020. Agronomed insists that it was not interested in selling its assets around this time and never discussed doing so with Lazer; its only focus was raising capital for Agronomed Bio and Agri-Kind and finding a purchaser for Franklin's interest in Agronomed Bio. Lazer, however, asserts that Agronomed was open to selling its assets. But regardless, this is not a material fact, because whether the parties discussed an asset sale in June or July 2020 does not factor into whether either side manifested an intent to be bound by an express contract for Lazer to perform services for Agronomed, whether Agronomed promised to pay Lazer fees in exchange for services rendered extracontractually, or whether Lazer performed any services for Agronomed at all. Even with this fact in dispute, it is clear that there was no contract or services performed, as discussed in depth in Section IV.

[4] Lazer admits that there were no email communications between Agronomed and Lazer between mid-July 2020 and April 22, 2021. (Pl.'s Resp. to Defs.' Statement of Undisputed

In August 2020, The Healing Center ("THC"), which has no affiliation with Lazer or Verano, agreed to purchase Franklin's interest in Agronomed Bio and provide $11.75 million in additional capital. (Defs.' SUMF ¶ 70; Lipschitz Dep. at 294-95; Deposition of Dean Lazer ("Dean Lazer Dep.") at 226.) Around the same time, one of Agronomed's existing lenders also agreed to increase Agri-Kind's existing note by $11 million. (Cohn Dep. at 103-05.) The THC-Franklin transaction closed in early January 2021. (Defs.' SUMF ¶ 71.)

### E.    Agronomed and Verano Connect Again in 2021

Verano reasserted its interest in Agronomed in early 2021. On January 26, 2021, Jay Richards, co-owner of THC, and Dorf spoke on the phone about a potential transaction. (Cohn Decl. Ex. 16 at AGR_0001059.) The next day, Dorf emailed Richards and John Lubimir, the other co-owner of THC, stating that Verano would be "putting together a [due diligence] request . . . so we can better understand the real estate holdings, and deal structure you have with [Cohn]" and that he would "set[] up an in person meeting." (*Id.*) Richards replied to Dorf later that day, copying Cohn, that Cohn "has been informed of our conversation" and was "open" to a meeting. (*Id.*)

On February 2, 2021, Brian Ward, Verano's Vice President of Finance, circulated a draft term sheet for an acquisition of Agronomed Bio by Verano to Cohn, Richards, and Lubimir. (Cohn Decl. Ex. 17 at AGR_0001064.) This term sheet called for Verano to purchase "100% of the equity interests of [Agronomed Bio] for [$60 million in cash and securities]." (*Id.* at AGR_0001065.) On February 4, Ward sent Richards, Lubimir, and Cohn diligence materials. (Cohn Decl. Ex. 18.)

---

Material Facts [Pl.'s Resp. Defs.' SUMF] ¶¶ 80-81.) Although Lipschitz testified that he could not recall whether persons from Agronomed and Lazer spoke on the phone during that time, Lazer has failed to adduce any evidence—whether phone records or testimony from other witnesses—demonstrating any impactful communications in furtherance of the Agronomed-Verano acquisition during that period. (Lipschitz Dep. at 294.) Lazer's mere citation to Lipschitz's deposition testimony discussing his "trust" in Agronomed to pay Lazer based on the June 10 Email is insufficient to legitimately dispute the nine-month silence between Agronomed and Lazer. (*Id.* at 291-92; Pl.'s Resp. Defs.' SUMF ¶¶ 80-81.)

On April 22, 2021, Agronomed and Verano announced Verano's acquisition of all Agronomed entities. (Defs.' SUMF ¶ 82; Press Release, Verano to Add Cultivation and Fortify Retail Capacity in Pennsylvania (Apr. 22, 2021), https://investors.verano.com/news/news-details/2021/Verano-to-Add-Cultivation-and-Fortify-Retail-Capacity-in-Pennsylvania/default.aspx.)

On April 23, 2021, Lipschitz replied to his previous email thread with Cohn containing the June 10 Email. (Pl.'s Ex. 21 at LAZ000767.) Lipschitz wrote:

> Congratulations on the transaction with Verano! It's a terrific deal for both parties and we're very happy for you and your team. I wanted to follow-up on the [June 10 Email] to ensure our fees are properly accounted for. Let us know how we can be helpful and further add value to the process.

(*Id.*)

Cohn replied:

> Greg, our discussion was completely around last year and we never signed any agreements. Don't even try to play that game. We have contacts with [Verano] going back two and a half years and you were told that at the time and you did nothing for the transaction including an intro.

(*Id.*)

This was Lazer's first communication with Agronomed since July 2020. (Lipschitz Dep. at 291-94; Cohn Decl. Ex. 19.)

## II.    PROCEDURAL HISTORY

Approximately three weeks later, on May 17, 2021, Lazer filed suit against Agronomed. Agronomed answered the Complaint on June 17, 2021. (ECF No. 4.) Agronomed moved for summary judgment on May 16, 2022, and Lazer moved for partial summary judgment on May 19, 2022. (ECF Nos. 25-26.)

The Complaint asserts four causes of action. Count One asserts a breach of contract claim alleging that Agronomed and Lazer entered into a contract on June 10, 2020 entitling Lazer to a fee when Verano acquired Agronomed. Count Two, asserted in the alternative should the Court find that there was not a contract, asserts a promissory estoppel claim based on Lazer's alleged performance of work for Agronomed in reliance on Cohn's promise to pay Lazer fees should Verano and Agronomed enter into a transaction. Count Three, also asserted in the alternative should the Court find that there was not a contract, asserts an unjust enrichment claim based on Lazer's alleged performance of work for Agronomed that conferred benefits on Agronomed in furtherance of Verano's acquisition of Agronomed. Finally, Count Four asserts a fraudulent inducement claim based Lazer's alleged reliance on Cohn's misrepresentation that Agronomed would pay Lazer fees if Verano transacted with Agronomed.

## III.     LEGAL STANDARD

Summary judgment is appropriate when the record discloses no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). Material facts are those "that could affect the outcome" of the proceeding, and "a dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving party." *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011). The moving party bears the burden of showing that the record reveals no genuine issue as to any material fact. *Anderson*, 477 U.S. at 256. When the moving party does not bear the burden of persuasion at trial, the moving party may meet this burden by showing that the non-moving party's evidence is insufficient to carry its burden at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). Once the moving party meets this burden, the nonmoving party must "come forward with specific facts showing there is

a genuine issue for trial." *Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 192 (3d Cir. 2015) (quoting *Anderson*, 477 U.S. at 252). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita*, 475 U.S. at 587 (quotation marks omitted).

In reviewing the record, "a court must view the facts in the light most favorable to the nonmoving party and draw all inferences in that party's favor." *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994). The court may not, however, make credibility determinations or weigh the evidence in considering motions for summary judgment. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133, 150 (2000) (citing *Anderson*, 477 U.S. at 254-55).

When cross-motions for summary judgment are filed, each party claims that it alone is entitled to summary judgment. "[T]he making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waives judicial consideration and determination whether genuine issues of material fact exist." *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). Rather, each movant must still show that no genuine issue of material fact exists, and if both parties fail to carry their respective burdens, the court must deny the motions. *See Facenda v. NFL Films, Inc.*, 542 F.3d 1007, 1023 (3d Cir. 2008).

## IV.    DISCUSSION

Agronomed has moved for summary judgment as to Lazer's breach of contract, promissory estoppel, unjust enrichment, and fraudulent inducement claims. Lazer has moved for partial

summary judgment as to only its breach of contract claim. The Court will grant summary judgment in full for Agronomed and, correspondingly, deny summary judgment for Lazer in connection with the sole claim as to which it moved. The Court addresses each claim in turn.

### A.     Breach of Contract

Both parties have moved for summary judgment as to Lazer's breach of contract claim. Lazer argues that the June 5 Document and the June 10 Email jointly constitute a binding, express contract between Agronomed and Lazer that Agronomed breached by not paying Lazer a fee upon the closing of the Agronomed-Verano acquisition. Agronomed argues that there was never a contract between it and Lazer.

In Pennsylvania, it is well-established that the party seeking to establish the breach of a contract first must demonstrate the existence of that contract. *McShea v. City of Phila.*, 995 A.2d 334, 340 (Pa. 2010). An enforceable contract exists when "both parties have manifested an intention to be bound by its terms[,] . . . the terms are sufficiently definite to be specifically enforced," and "there [is] consideration on both sides." *Channel Home Ctrs. v. Grossman*, 795 F.2d 291, 298-99 (3d Cir. 1986). "For a contract to be enforceable, the nature and extent of the mutual obligations must be certain, and the parties must have agreed on the material and necessary details of their bargain." *Lackner v. Glosser*, 892 A.2d 21, 30 (Pa. Super. Ct. 2006). "Under Pennsylvania law, 'where the facts are in dispute, the question of whether a contract was formed is for the jury to decide.'" *Quandry Sols. Inc. v. Verifone Inc.*, Civ. A. No. 07-97, 2009 WL 997041, at *5 (E.D. Pa. Apr. 13, 2009) (quoting *Ingrassia Constr. Co. v. Walsh*, 486 A.2d 478, 482 (Pa. Super. Ct. 1984)). "However, '[t]he question of whether an undisputed set of facts establishes a contract is a matter of law.'" *Id.* (quoting *Mountain Props., Inc. v. Tyler Hill Realty Corp.*, 767 A.2d 1096, 1101 (Pa. Super. Ct. 2001)).

"It is by now hornbook law that the test for enforceability of an agreement is whether both parties have manifested an intention to be bound by its terms and whether the terms are sufficiently definite to be specifically enforced." *ATACS Corp. v. Trans World Commc'ns, Inc*., 155 F.3d 659, 665 (3d Cir. 1998). "In assessing intent, the object of the inquiry is not the inner, subjective intent of the parties, but rather the intent a reasonable person would apprehend in considering the parties' behavior." *Am. Eagle Outfitters v. Lyle & Scott Ltd.*, 584 F.3d 575, 582 (3d Cir. 2009). "That is to say, a contract exists if a party's overt actions suggest its existence and provide evidence on which a reasonable jury could find the party manifested [its] intent to form the contact." *Creghan v. Procura Mgmt., Inc.*, 91 F. Supp. 3d 631, 641 (E.D. Pa. 2015) (citing *Ingrassia Constr. Co.*, 486 A.2d at 483).

Although "[t]he presence or absence of a signed writing is relevant to [determining intent], [it] is not dispositive." *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 201 (3d Cir. 2012) (citing *Am. Eagle Outfitters*, 584 F.3d at 584). Instead, if the parties "have agreed to the essential terms of a contract, 'the fact that they intend to formalize their agreement in writing but have not yet done so does not prevent enforcement of such agreement.'" *Id.* (quoting *Mazzella v. Koken*, 739 A.2d 531, 536 (Pa. 1999)). "[M]erely engaging in negotiations, drafting preliminary documents, or agreeing 'to enter into a binding contract in the future,'" however, "does not create an enforceable contract 'because the parties themselves have not come to an agreement on the essential terms of the bargain and therefore there is nothing for the court to enforce.'" *Id.* (quoting *Am. Eagle Outfitters*, 584 F.3d at 582); *see also Philmar Mid-Atl., Inc. v. York St. Assocs. II*, 566 A.2d 1253, 1255 (Pa. Super. 1989) (citing *Goldman v. McShain*, 247 A.2d 455, 458 (Pa. 1968)) ("Absent a manifestation of an intent to be bound, [] negotiations concerning the terms of a possible future contract do not result in an enforceable agreement.").

Here, on this record, no reasonable jury could find that Lazer and Agronomed mutually manifested an intent to enter into a binding contract in June 2020. Any document exchange or communications between the two amounted to, at most, an agreement to agree.

First, the thread containing the June 10 Email—which Lazer insists is the smoking gun manifesting Agronomed's agreement to pay Lazer—in reality demonstrates precisely the opposite. Foremost is Agronomed's concern regarding its significant exposure to legal liability, as Agronomed believed that the June 3 Document "violates US securities laws." (Pl.'s Ex. 8 at LAZ000597.) On June 4, Cohn took great pains to explain to Lipschitz Agronomed's precarious legal position, blatantly stating that there "is no way [the June 3 Document] can be executed in its current state." (*Id.*) Lipschitz then revised the section of the June 3 Document with which Agronomed's counsel took issue, but, in the June 10 Email, Cohn relayed that Agronomed's counsel still found the edits insufficient. (Pl.'s Ex. 13 at LAZ000631.) Agronomed's counsel had requested that Lazer "work[] out an approach based on the M&A advisement memo that many in our space leverage for protection" and include "a full indemnification to Agronomed for any potential conflicts, securities violations etc." (Pl.'s Ex. 8 at LAZ000597.) But Cohn flagged to Lipschitz that the June 5 Document "didn't reference the M&A exemption memo," causing Agronomed's counsel to question how Lazer could even "provide [] value add services" to Agronomed at all. (Pl.'s Ex. 13 at LAZ000631.) The Court finds it unreasonable that a sophisticated business entity such as Agronomed would ever execute an agreement that its counsel advised violates the law and that had not been modified to allay their concerns.[5] (*See* Pl.'s Ex. 8 at LAZ000597 ("We . . . simply cannot sign that agreement and expose our company to liability.").)

---

[5] Although Cohn wrote that he personally was "OK signing [the June 5 Document] as is," the lingering, unanswered question from Agronomed's counsel regarding "the M&A exemption memo" indicates that Cohn would have needed to run any document by Agronomed's counsel

Lazer also ignores other statements in Cohn's June 10 Email that demonstrate that Cohn did not intend to bind Agronomed to an agreement with Lazer, including that he explicitly told Lipschitz that "it doesn't make sense to engage anyone else at this time" and Lazer should "hold off." (Pl.'s Ex. 13 at LAZ000631.) Cohn further informed Lipschitz that Agronomed already "ha[s] a number of brokers actively working" for Agronomed, referring to Kronos, Young America, and GreenVision, and that Agronomed would not sign an agreement unless it were "scoped to Verano" since the other finders had already engaged other non-Verano companies. (*Id.*; Cohn Dep. at 83-84, 102-06.) Neither party has pointed to any additional edits made to narrow Lazer's engagement to Verano, further demonstrating that the June 5 Document was merely a draft. Cohn writing that Agronomed would "commit to paying the fees to you guys (*and signing your agreement*)" also indicates that Cohn did not intend to bind Agronomed to the June 5 Document's terms—including "paying [Lazer's] fees"—until the document was signed, which it never was. (Pl.'s Ex. 13 at LAZ000631 (emphasis added).) Cohn's optimism that one day an agreement might be reached does not provide the Court the freedom to ignore the many signs that one was not in June 2020. *See Pae Young Chung v. Byong Jik Choi*, Civ. A. No. 07-2187, 2008 WL 3852237, at *3 (E.D. Pa. Aug. 18, 2008) ("The defendants' agent, Ron Choi, replied to [an] email on April 29, 2006 by writing, 'let's look at new tenant's credit report before we accept the offer in it's [sic] entirety however.' This statement, despite expressing an optimism that a deal might eventually be reached, explicitly denied an intent to accept plaintiff's offer without first passing upon the credit of the new tenant. Absent such intent, the parties did not create a valid, binding contract."), *aff'd*, 335 F. App'x 172 (3d Cir. 2009).

---

again prior to its execution; it is far from clear—doubtful, in fact—that Cohn himself had the last word on whether Agronomed was "OK signing" anything. (Pl.'s Ex. 13 at LAZ000631.)

Lazer's insistence that it intended to be bound by any June 2020 agreement with Agronomed is belied by its own conduct. Lipschitz himself recognized the need to "further hash out" an agreement between Agronomed and Lazer after receiving Cohn's June 10 Email, evincing his belief that the June 5 Document was a draft. (Pl.'s Ex. 13 at LAZ000631; Lipschitz Dep. at 183.) Cohn told Lipschitz that he would "commit . . . now if we just make the agreement scoped to Verano," but Lipschitz made no further edits to the June 5 Document. (*Id.*; *see also* Cohn Decl. Ex. 11 at LAZ000614-15; Cohn Dep. at 83-84.) And most glaringly, it is undisputed that Lazer ceased communications with Agronomed for nearly a year: from mid-July 2020 through the date on which Agronomed announced its deal with Verano in April 2021. (Lipschitz Dep. at 291-94; Cohn Decl. Ex. 19.) This silence came after Archos did not show up to a site visit at Agronomed's facilities. (Cohn Dep. at 149-50; Cohn Decl. ¶¶ 72-73.) None of this behavior comports with an agreement for Lazer to service Agronomed.[6]

Further, the June 5 Document, from an aesthetic standpoint, looked nothing like a final contract, despite *Lazer*—which seeks its enforcement—last circulating a draft. It is undisputed that the June 3 Document constituted Lazer's standard engagement agreement containing no

---

[6] The parties dispute whether Lazer formally represented Verano during this time. Agronomed points to a series of emails from June 2020 containing language indicative of Lazer working on Verano's behalf, in support of the proposition that Lazer's representation of Verano shows that it could not have intended to be bound by an agreement with Agronomed as it sought the most competitive deal terms for Verano. (*See, e.g.*, Defs.' Ex. C at LAZ000642 (Dorf: "Greg this is a formal invitation to come join the Verano team."); Defs.' Ex. D at LAZ000644 (Dorf: "[Y]ou guys represent us . . . ."); Defs.' Ex. F at LAZ000649 (Dorf: "[J]ust beat [Cohn] up and see what we can really get the grow for cash and stock [sic].").) Nevertheless, there has been no evidence of any formal engagement agreement between Lazer and Verano presented to the Court. The Court also understands that, as Lazer stresses, Lazer must work and communicate with both sides of a transaction in its capacity as a finder; it is entirely reasonable that the language in the June 2020 communications spotlighted by Agronomed is merely banter. In any event, this disputed fact is not material to the Court's summary judgment decision in favor of Agronomed on this count, as there is other evidence of Lazer's conduct demonstrating that Lazer did not intend to be bound by an agreement with Agronomed.

personalization to reflect Agronomed's engagement of Lazer. (Pl.'s SUMF ¶ 18; Defs.' SUMF ¶ 39.) The word "Agronomed" does not once appear in the document. And even after Lipschitz's edits, the June 5 Document contained extensive redlining, as well as blank spaces and yellow highlighting in place of an effective date and counterparty. (Cohn Decl. Ex. 11 at LAZ000601, 03-04, 10, 13.) The fee structure remained the same as it did in the June 3 Document, even after the parties discussed a modified structure via email. (*Id.* at LAZ000604.) Neither party ever signed the June 3 Document or June 5 Document. (*Id.* at LAZ000613; Cohn Decl. Ex. 8 at LAZ000585.) This provides further indication that—in the eyes of both parties—the June 5 Document constituted nothing more than a draft, preliminary document. *See Rock v. Rangos*, 61 A.3d 239, 244 n.4 (Pa. Super. 2013) (quoting *Certainteed Corp. v. Celotex Corp.*, Civ. A. No. 471, 2005 WL 217032, at *14 (Del. Ch. Jan. 24, 2005)) (invoking case applying Delaware law as persuasive authority for the proposition that "[e]ven in circumstances when commercial parties draft a term sheet that is intended to serve as a template for a formal contract, the law of this state, in general, prevents the enforcement of the term sheet as a contract if it is subject to future negotiations because it is, by definition, a mere agreement to agree"); *see also LC W. Chester LLC v. PL Real Est. LLC*, Civ. A. No. 19-3656, 2022 WL 160287, at *7 (E.D. Pa. Jan. 18, 2022) ("These emails, however, do not create a binding contract, nor do they bind Plaintiff and/or Defendant. Critically, the preponderance of the evidence establishes that there was no 'meeting of the minds' or mutual assent to be bound. Neither [party] intended or agreed that [the relevant] email communications, as opposed to a signed formal document, would create a binding contract."); *Pae Young Chung*, 2008 WL 3852237, at *3 ("Further underscoring our conclusion that Choi did not intend to accept plaintiffs' offer is the importance of the major undefined terms, namely, the identity and creditworthiness of the lessee.").

Lazer cannot conjure an express contract out of an unfinished, draft agreement coupled with cherry-picked words in one email. Consequently, the Court grants summary judgment for Agronomed and denies it for Lazer as to Count One.

### B. Promissory Estoppel

Agronomed has moved for summary judgment as to Lazer's promissory estoppel claim. Lazer argues that it rendered services for Agronomed and facilitated its acquisition by Verano in reliance on Cohn's promise to pay Lazer's fees. Agronomed argues that Lazer had nothing to do with the ultimate acquisition.

The doctrine of promissory estoppel permits a plaintiff to enforce a promise in the absence of a contract. *Sullivan v. Chartwell Inv. Partners, LP*, 873 A.2d 710, 717 (Pa. Super. Ct. 2005). To establish a promissory estoppel claim in Pennsylvania, a plaintiff must show that "(1) the promisor made a promise that he should have reasonably expected to induce action or forbearance on the part of the promisee; (2) the promisee actually took action or refrained from taking action in reliance on the promise; and (3) injustice can be avoided only by enforcing the promise." *Crouse v. Cyclops Indus.*, 745 A.2d 606, 610 (Pa. 2000).

Here, the Court finds that Lazer's promissory estoppel claim fails because Lazer did not act in reliance on any promise. Even if, as Lazer asserts, the June 10 Email constituted a promise that Cohn and Agronomed should have reasonably expected to induce action on Lazer's part, there is nothing in the record showing that Lazer ever actually performed any services for Agronomed. Most tellingly, Lazer did not communicate with Agronomed for nearly a year, from mid-July 2020 until after the Agronomed-Verano acquisition's closing date in April 2021. (Lipschitz Dep. at 291-94; Cohn Decl. Ex. 19.) Although Lazer maintains that it "continued to work on the transaction" during and after June and July 2020, (Lipschitz Dep. at 242), Lazer points to nothing more than

half-baked evidence that signifies that it was not involved in organizing Verano's ultimate acquisition of Agronomed.

Lazer baldly asserts that it provided five types of services to Agronomed:

First, Lazer says that it arranged meetings and phone calls between Agronomed and Verano. (Pl.'s SUMF ¶¶ 43-46.) However, according to the record, the last communication involving Lazer, Agronomed, and Verano took place on July 7, 2020. (Pl.'s Ex. 19.) And the last relevant communication involving Lazer and Verano took place on July 8, 2020. (Pl.'s Ex. 20; Pl.'s Resp. Defs.' SUMF ¶ 69.) There is no further record of any calls or meetings arranged at any time between then and the announcement of Verano's acquisition of Agronomed more than nine months later.

Second, Lazer says that it organized Archos' site visit to Agronomed's facilities. (Pl.'s SUMF ¶ 46.) However, that visit never happened, as Archos did not show up. (Cohn Dep. at 149-50; Cohn Decl. ¶¶ 72-73.) And even so, the record shows that Cohn—and not anyone from Lazer— requested and planned Archos' doomed visit. (Pl.'s Ex. 16 at LAZ000742.) Lazer has not presented the Court with any additional evidence showing that any site visits ever took place at all, let alone one it arranged between July 8, 2020 and April 22, 2021.

Third, Lazer says that it facilitated the exchange of due diligence materials. (Pl.'s SUMF ¶ 46.) However, the record shows that Dorf—and not anyone from Lazer—first requested the creation of an Agronomed-Verano data room. (Pl.'s Ex. 16 at LAZ000742-43.) Lazer also confusingly cites to only an email from Cohn to Lipschitz sharing a link to the data room for the proposition that "Lipschitz expended significant time and effort working to organize, review, analyze and summarize Defendants' business and financial records"—but points to no evidence demonstrating any organizing, reviewing, analyzing, or summarizing on the part of Lipschitz.

(Pl.'s SUMF ¶ 46 (citing Pl.'s Ex. 17 (email from Cohn in which he shares "the link to the data room we are consolidating for you guys")).)

Fourth, Lazer says that Lipschitz "translat[ed] the disorganized information Cohn provided into a comprehensible form for Sammy Dorf." (Pl.'s SUMF ¶ 48.) But, despite repeated representations about Cohn's purportedly slipshod comportment, Lazer has not imparted to the Court how, exactly, any information provided by Cohn was disorganized, let alone what Lazer did to serve Agronomed in "translating" it. As evidence for this point, Lazer highlights only one email from Lipschitz to Dorf in which Lipschitz summarizes a phone call he had with Cohn—hardly an indictment of Cohn's organizational or communicational capabilities. (Pl.'s Ex. 18.)

Finally, Lazer says that Lipschitz "impressed upon Dorf that, due to space constraints and unique licensure arrangements, Defendants' assets would be much more valuable if acquired together, which meant both the Agri-Kind and Agronomed Bio facilities." (Pl.'s SUMF ¶ 49.) But, despite a July 6, 2020 email in which Lipschitz suggests to Dorf that "you need both locations in this transaction," Lazer does not cite to any evidence showing that this single sentence or anything else planted a seed in Dorf or Verano's mind that resulted in the Agronomed-Verano acquisition nine months later. (Pl.'s Ex. 18 at LAZ000758-59.) Lipschitz's email also does not reference Agronomed's other entities, which Verano also acquired in the ultimate transaction.[7]

Beyond Lazer's nine-month silence, Agronomed also demonstrated that Lazer played no part in the renewed talks between Agronomed and Verano that led to Agronomed's eventual

---

[7] The Court further notes that Lazer did not even introduce Agronomed to Verano in the first place. *See Flowers v. ConnectAmerica.com, LLC*, Civ. A. No. 12-4787, 2014 WL 4762643, at *11-12 (E.D. Pa. Sept. 24, 2014) (citing *Kinnel v. Mid-Atl. Mausoleums, Inc.*, 850 F.2d 958, 962 (3d Cir. 1988) and *Amerofina, Inc. v. U.S. Indus., Inc.*, 335 A.2d 448, 451-52 (Pa. Super. Ct. 1975)). Instead, Fitze introduced representatives of the two companies in 2018, after which Verano took its first stab at acquiring Agronomed. (Cohn Decl. ¶¶ 11-12; Cohn Dep. at 21-22.) It is undisputed that Fitze has no relation to Lazer. (Defs.' SUMF ¶ 8.)

acquisition. Instead, THC—which, notably, purchased Franklin's interest in Agronomed Bio in August 2020 after Lazer left the picture—reconnected Cohn and Dorf in January 2021. (*See* Cohn Decl. Ex. 16.) It is undisputed that Lazer has no relationship with THC. (Lipschitz Dep. at 294-95; Dean Lazer Dep. at 226.)

Accordingly, because no reasonable jury could find that Lazer rendered Agronomed services in reliance on Cohn's June 10 Email, the Court grants summary judgment for Agronomed as to Count Two.

### C.   Unjust Enrichment

Agronomed has moved for summary judgment as to Lazer's unjust enrichment claim. Lazer argues that it conferred benefits upon Agronomed by working in furtherance of its acquisition by Verano, warranting the fees promised in the June 10 Email. Agronomed argues that Lazer did not confer any benefit upon it.

The doctrine of unjust enrichment allows for recovery in the absence of a contract when "the party against whom recovery is sought either wrongfully secured or passively received a benefit that it would be unconscionable for her to retain." *Torchia v. Torchia*, 499 A.2d 581, 582 (Pa. Super. 1985) (quotation marks and citation omitted). Unjust enrichment in Pennsylvania requires the following elements: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendant to retain the benefit without payment of value." *Mitchell v. Moore*, 729 A.2d 1200, 1203-04 (Pa. Super. Ct. 1999).

Here, the Court finds that Lazer's unjust enrichment claim fails because it did not confer any benefit upon Agronomed. In support of its unjust enrichment claim, Lazer points to the same "services" it rendered that also purportedly form the basis of its promissory estoppel claim. And

for the same reasons it finds that Lazer did not render Agronomed services in reliance on any promise for fees, the Court finds that Lazer did not confer a benefit upon Agronomed via those unperformed, nonexistent services.

Accordingly, the Court grants summary judgment for Agronomed as to Count Three.

### D.    Fraudulent Inducement

Finally, Agronomed has moved for summary judgment as to Lazer's fraudulent inducement claim. Lazer argues that the June 10 Email's promise to pay Lazer's fees fraudulently induced Lazer to perform services in furtherance of Agronomed's acquisition by Verano. Beyond restating that Lazer did not perform services for it, Agronomed also argues that the June 10 Email was forward-looking and that Cohn did not have the requisite mindset to defraud Lazer.

In Pennsylvania, the elements of fraud in the inducement are as follows: "(1) a representation; (2) which is material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness as to whether it is true or false; (4) with the intent of misleading another into relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance." *Eigen v. Textron Lycoming Reciprocating Engine Div.*, 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005). A plaintiff must prove these elements with clear and convincing evidence. *EBC, Inc. v. Clark Bldg. Sys., Inc.*, 618 F.3d 253, 275-76 (3d Cir. 2010).

Here, the Court finds that Lazer's fraudulent inducement claim—which appears to be a repackaged version of its promissory estoppel claim—fails for the same reasons as that claim: namely, Lazer did not render Agronomed services in justifiable reliance on any promise made by Agronomed. Lazer has also pointed to no evidence, let alone the requisite clear and convincing evidence, demonstrating that Cohn intended to deceive Lazer.

Further, Cohn's statement regarding Lazer's fees is far too qualified to constitute a representation on which Lazer could have justifiably relied. Cohn stated, reprinted in full: "That being said, if Verano does move forward on this transaction, we do commit to paying the fees to you guys (and signing your agreement) at the time of next steps (or now if we just make the agreement scoped to Verano)." (Pl.'s Ex. 13 at LAZ000631.) In other words, Cohn said that *if*—a qualification—Verano moves forward on *this*—current, June-July 2020—transaction, Agronomed would commit to paying Lazer's fees and signing an agreement with them, either *at the time of next steps*—in the future—or at that time, in June 2020, *if*—another qualification—that agreement were narrowed only to involve Verano—which it never was.[8] *See Harrison v. Cabot Oil & Gas Corp.*, 887 F. Supp. 2d 588, 592 (M.D. Pa. 2012) (quoting *Nat'l Data Payment Sys. Inc. v. Meridian Bank*, 212 F.3d 849, 858 (3d Cir. 2000)) ("A statement as to future plans or intentions is not fraudulent under Pennsylvania law unless it knowingly misstates the speaker's true state of mind when made.") (quotation marks omitted), *aff'd*, 608 F. App'x 128 (3d Cir. 2015).

Accordingly, the Court grants summary judgment for Agronomed as to Count Four.

## V.   CONCLUSION

For the reasons discussed above—and playing the unenviable role as a buzzkill for Lazer—the Court grants Agronomed's motion for summary judgment as to all counts and denies Lazer's motion for summary judgment as to Count One. Given the finality of the Court's decision, the Court is hopeful that the parties can now turn over a new leaf. An Order consistent with this Memorandum will be docketed separately.

---

[8] This general sentiment also applies to the analysis as to whether this statement was a "promise" for purposes of Lazer's promissory estoppel claim.